## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

CRYSTAL LAGOONS U.S. CORP., et al.,

      Plaintiffs,

v.                                                                  Case No: 8:23-cv-519-TPB-AEP

OASIS AMENITIES, LLC, et al.,

      Defendants.

_____ /

## ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on:

- "Unique Aquatic Design, Inc.'s Motion for Partial Summary Judgment on Two Issues: (1) Defendants Did Not Misappropriate the Trade Secrets, and (2) Defendants Did Not Proximately Cause Lost Profits" (Doc. 329);

- "Oasis Amenities, LLC, Scott Andreasen, Dean Atkinson, Raymond Douglas Hall, and Jacob Rodgers' Motion for Summary Judgment" (Doc. 330); and

- "Com Pac Filtration, Inc's Motion for Partial Summary Judgment: Plaintiffs' Information Does Not Qualify as a Trade Secret" (Doc. 331).

Plaintiffs filed responses to the motions on January 17, 2025. (Docs. 348; 349; 350). Defendants filed replies on January 31, 2025. (Docs. 356; 358; 359). Defendant Unique Aquatic Designs, Inc., filed a supplemental reply in support of its summary judgment motion, and Plaintiffs filed a supplemental opposition to that motion, on March 14, 2025. (Docs. 371; 372). The Court held a hearing to address

these motions and other matters on March 26, 2025.   (Doc. 376).[1]   Upon review of the motions, responses, replies, court file, argument of counsel, and the record, the Court finds as follows:

## Background

This case presents a business dispute between competitors involved in the creation of large bodies of clear water to be used for swimming and other recreational activities, which the Court will refer to generically as "lagoons." Plaintiffs Crystal Lagoons U.S. Corp. and Crystal Lagoons Technologies, Inc. (together, "Crystal Lagoons" or "Plaintiffs") provide their developer clients with information and services for the design, construction, and operation of lagoons, and have been involved in the creation of numerous such lagoons located around the world.

In July 2014, Crystal Lagoons and Epperson Ranch, LLC, an entity controlled by Metro Development, entered into a "Technology Licensing and Services Agreement" ("TLSA") for a lagoon to be built in Pasco County, Florida.[2] (Doc. 352-1, Ex. 3).   Under the TLSA, Crystal Lagoons would provide basic designs

---

[1] Lagoon Funatics, LLC filed a motion for summary judgment.   (Doc. 327).   Plaintiffs responded and Lagoon Funatics filed a reply.   (Docs. 351; 357).   Lagoon Funatics, however, was dismissed as a defendant as the result of a settlement, and the Court therefore will not consider its motion.   In a brief endorsed order following the hearing, the Court ruled that disputed issues of fact remained as to whether Plaintiffs possess one or more trade secrets misappropriated by Defendants and stated that that a more detailed order would follow.   (Doc. 377).

[2] The TLSA is between Crystal Lagoons U.S. Corp. another Crystal Lagoons entity, and Epperson Ranch, LLC.   It appears that Epperson Ranch, LLC is a development vehicle created and controlled or managed by Metro Development.   For convenience, the Court will generally refer to this and other similar contracts as contracts between Plaintiffs and Metro Development.

for a lagoon along with technical information and specifications to Metro, who would engage contractors to finalize the designs and construct the lagoon, with continuing input and approval by Crystal Lagoons.   The TLSA provided for an initial up-front payment to Crystal Lagoons, followed by additional payments when the lagoon was constructed, filled, and determined to meet certain requirements. Crystal Lagoon would then provide services in connection with the operation of the lagoon in exchange for a monthly fee.   TLSAs for additional lagoons in Florida and elsewhere followed.   (Docs. 352-1, Ex.4; 352-2, Exs. 5-6).   In April 2018, Plaintiffs entered into contracts with Metro to provide their lagoon technology for four additional lagoon projects, known as Moccasin Wallow (located in Parrish and later known as Parrish Lakes), Angeline Ranch, Oak Stone, and Ridgewood (together the "New Metro Contracts").   *See* (Doc. 352-4, Exs. 9-12).   In July 2019, Plaintiffs and Metro entered into a memorandum of understanding with respect to a "Regional Master Agreement" for "Public Access Lagoon" projects.   (Doc. 352-5, Ex. 14).

The individual Defendants in this case are Dean Atkinson, Scott Andreasen, Raymond Hall, and Jacob Rogers.   Atkinson, a mechanical engineer, is the owner and principal of Defendants Com Pac Filtration, Inc., and Unique Aquatic Design, Inc. ("UAD").   Hall, an engineer, is the qualifier for UAD and performs engineering work for UAD as an employee of another company that contracts with UAD. Andreasen, a landscape architect, is a member and vice president of Lagoon Funatics, LLC, a management company that operates amenities connected to lagoons.   Rogers is a construction contractor.

The individual Defendants became involved as contractors in Crystal Lagoons projects and in the course of work on those projects received information relating to Crystal Lagoons' technology.   *See* (Docs. 352-3, Ex. 7, ¶¶ 8-36; 352-8, Ex. 41; 352-13 to 352-20, Exs. 115-153).   Prior to their work on Crystal Lagoon projects, Hall, Andreasen, and Rogers had not worked on lagoons similar to those offered by Plaintiffs.   *See* (Docs. 352-5, Ex. 16 at 8-18; 352-6; 352-8, Ex. 38 at 29-32 and Ex. 40 at 66).   Atkinson testified in deposition he had worked on at least four "large water impoundment" projects that used a different water treatment system from that used in Plaintiffs' lagoons.   (Doc. 352-6, Ex. 32 at 26-31).

In May 2021, these four Defendants formed Defendant Oasis Amenities, LLC to offer its own technology for what it called an "Oasis Spring," which would compete with Plaintiffs' "Crystal Lagoon" product.   They initially considered naming their company "Clara Lagoons" but were concerned the name was too close to "Crystal Lagoons" and wanted to distinguish their company as well as steer clear of infringement.   (Doc. 352-8, Ex. 67).   A business plan worked on in mid-2021 budgeted no amounts for research and development.   *See* (Doc. 352-8, Ex. 66). Rogers testified in deposition that, speaking for himself, he had no explanation for this other than that they had learned what they needed from their work on Crystal Lagoons projects.   *See* (Doc. 352-8, Ex. 40 at 152-53).   The same document budgeted funds for "Legal (Crystal Lagoons Defense)" with a note referring to "Crystal Lagoon Law Suite [sic]."   (Doc. 352-8, Ex. 66).   Rogers testified, "I guess there was an assumption made that we were going to get sued, all of the

'similarities' between Oasis Springs and Crystal Lagoons."   (Doc. 352-8, Ex. 40 at 85).

In October 2021, Oasis prepared a "review of the lagoons" for an anticipated meeting with Metro Development, which analyzed features of Crystal Lagoons built by Metro development.   *See* (Doc. 352-8, Ex. 70).   In December 2021, Oasis pitched its "Lagoon Technology" to Metro Development, and in April 2022, Oasis contracted with a Metro Development affiliate to provide "all necessary engineering services to design and produce the required construction details for the construction of an approximately 3,880,000 gallon water feature (the "Spring")" at the development in Parrish.   *See* (Docs. 352-5, Ex. 18; 352-5, Ex. 19, at OasisAmenities_00021517). This was the same development for which Crystal Lagoons had entered into a TLSA in April 2018.   *See* (Doc. 352-4, Ex. 10).   In September 2022, Oasis submitted a letter of intent to Metro relating to six lagoon projects, three of which were already under contract with Crystal Lagoons.   *See* (Doc. 352-5, Exs. 20, 21).

In February 2023, Metro Development gave notice to Plaintiffs that it did not intend to proceed with them on further lagoon projects and requested a rescission of the New Metro Contracts.   (Doc. 327-10).   In August 2023, Oasis and Metro entered into another contract relating to the Parrish project, this one titled "Oasis Springs Technology Agreement," which appeared to involve the design and construction of an Oasis Spring at the Parrish project.   (Doc. 352-8, Ex. 72).   By April 2024, Oasis had prepared building permit drawings for Parrish Lakes.   (Doc. 352-5, Ex. 22).

In March 2023, Plaintiffs filed suit against Oasis and the individual
Defendants (collectively, the "Oasis Defendants"), Com Pac, and UAD,[3] contending
that they created the Oasis Springs product by misappropriating Plaintiffs' trade
secrets and confidential information.    Plaintiffs also contend that Defendants
interfered with Plaintiffs' business relationship and/or contracts with Metro.    This
conduct allegedly resulted in the loss of Plaintiffs' contracts with Metro for the
Parrish, Angeline Ranch, Oak Stone, and Ridgewood projects.

The operative second amended complaint includes counts for
misappropriation of trade secrets under federal and state statutes against all
Defendants, breach of contract (non-disclosure agreements) as to Atkinson,
Andreasen, Com Pac, and UAD, tortious interference with Plaintiffs' contractual
and business relationships as to the Oasis Defendants, and unfair trade practices
against the Oasis Defendants.    Defendants have filed motions for summary
judgment and partial summary judgment.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a
matter of law."    Fed. R. Civ. P. 56(a).    A properly supported motion for summary
judgment is not defeated by the existence of a factual dispute.    *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 249 (1986).    Only the existence of a genuine issue of
material fact will preclude summary judgment.    *Id.*

---

[3] As noted above, Plaintiffs also sued Lagoon Funatics, Inc., but that entity has been
dropped as a defendant as the result of a settlement.

The moving party bears the initial burden of showing that there are no genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor. *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

## Analysis

Com Pac moves for partial summary judgment seeking a ruling that Plaintiffs have no information protectible as trade secrets or by contract because the information at issue is generally known or has been publicly disclosed. UAD moves for partial summary judgment seeking a ruling that Defendants did not misappropriate any trade secrets and Plaintiffs have no lost profits caused by misappropriation. The Oasis Defendants move for summary judgment on the tortious interference claim against them. They also purport to adopt the arguments of the other Defendants on the trade secret issues in violation of Local Rule 3.01(f).[4] This Order will describe the asserted trade secrets in general terms

---

[4] The Oasis Defendants' rule violation is moot, as the Court by this Order has denied Com Pac's and UAD's motions on the trade secret claims. The parties appear to have further violated the page limitations imposed by Local Rule 3.01 by filing with their motions and responses lengthy "appendixes" presenting additional argument. No Defendant has moved for summary judgment as to Plaintiffs' claim for violation of FDUTPA. Plaintiffs' claims against Com Pac and UAD are asserted based on vicarious liability for the actions of

and then address misappropriation claims and request for lost profits, the claim for

breach of contract, and finally, the claim for tortious interference.

### *Trade Secret Misappropriation – Introduction*

Plaintiffs have chosen to bring extremely broad trade secret claims.   For

purposes of clarification, they have identified the information they contend

constitutes trade secrets in a document titled "Identification of Trade Secrets,"

referred to by the parties as the "Trade Secret Identification Document" or "TSID,"

The TSID is not a document maintained by Plaintiffs in the course of their business,

but it was instead generated during this litigation in order to clearly identify the

information Plaintiffs claim constitutes a trade secret or trade secrets.   The TSID

identifies the information at issue by category and subcategory, and it cross-

references the underlying documents Plaintiffs contend contain the trade secret

information.

Broadly speaking, Plaintiffs claim that all the information in the TSID, taken

together as a "compilation," constitutes a trade secret.   They also claim that

individual pieces of information within the compilation, approximately ten items,

constitute individual "standalone" trade secrets.

The compilation information in the TSID can be divided into two general

categories.   First, there are "technical trade secrets" listed in sections A through F

---

Atkinson.   Their summary judgment arguments, however, are not based on any distinction
between Defendants and for convenience the Court will from time to time refer to
arguments as having been made by "Defendants" generally or by the "Oasis Defendants."
Similarly, as the parties refer to the two "Plaintiffs" collectively and do not argue based on a
distinction between them, the Court for purposes of this Order will generally do the same.

relating to lagoon structure, design specifications, technical processes, and the like.
Second, categories G through K describe what Plaintiffs describe as "business trade
secrets," including matters such as methods for developing a lagoon, supplier and
vendor information, and customer information.   Plaintiffs argue that all the
information in the TSID, including both the technical and the business trade
secrets, taken together as a combination or compilation of information, constitutes a
trade secret.   Plaintiffs also appear to assert that the business trade secrets
component of their compilation constitute a distinct sub-set of information that is
itself a trade secret.

The claimed standalone trade secret claim is much more direct.   Those items
are reflected in TSID Sections B.1, C.1, D.1, E.1, E.4, E.5, E.10, H.1, I.1, and I.2,
discussed below.

### *Trade Secret Misappropriation- Compilation Trade Secret*

The Court turns first to the compilation trade secret, comprising all the
information in the TSID together.[5]

<u>Existence of Trade Secrets</u>

Plaintiffs assert claims for misappropriation under both the federal Defend
Trade Secrets Act and the Florida Uniform Trade Secrets Act.   The elements of a
claim under the two statutes are substantially the same.   *Compulife Software Inc.
v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020).   A plaintiff must prove the
existence of one or more trade secrets and misappropriation of trade secrets by the

---

[5] As noted below, it appears Plaintiffs do not contend that the information in Section F.7 to
F.10 is at issue.

defendant.   *Id*. at 1310; *La Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1269

(S.D. Fla. 2024).[6]

> A trade secret consists of:
>
> (1) "information" (including a formula, pattern, compilation, program,
>     device, method, technique or process) that
>
> (2) derives actual or potential independent economic value from not
>     being generally known to or ascertainable by others who can obtain
>     economic value from its disclosure or use, and
>
> (3) is the subject of efforts reasonable under the circumstances to
>     maintain its secrecy.

*See* 18 U.S.C. § 1839(3); § 688.002(4), *F.S.*

Defendants argue that Plaintiffs have no trade secrets.   For the reasons

discussed below, however, the Court finds the record presents issues of fact on each

of the above elements.

First, Plaintiffs have identified the information they contend constitutes a

trade secret, consisting of an extensive array of methods, processes, and

specifications which Plaintiffs license to developers to use in creating lagoons,

described in the TSID.   A trade secret may consist of a combination, compilation, or

integration of individual elements.   *See, e.g.*, *Compulife*, 959 F.3d at 1314; *Mapei*

*Corp. v. J.M. Field Mktg., Inc*, 295 So. 3d 1193, 1199 (Fla. 4th DCA 2020); 18 U.S.C.

§ 1839(3); § 688.002(4), *F.S.*   Accordingly, Plaintiffs have met the first element

required for protection.

---

[6] A claim under the federal Defend Trade Secrets Act also requires the plaintiff to prove
that the trade secret relates to a product or service used in, or intended for use in,
interstate commerce.

Second, there is record evidence supporting a finding for Plaintiffs on the
second element, *i.e.*, that the information derives independent economic value by
virtue of not being generally known to those who could make economic use of it.
Among other things, Plaintiffs have proffered expert testimony by David Peterson, a
licensed engineer with extensive experience in the aquatics industry, who opines
the entire compilation or combination of information identified in the TSID derives
economic value by virtue of not being generally known to others in the aquatics
industry.    *See* (Doc. 323-1).    Another of Plaintiffs' experts, David Sangree, opines
that the business trade secrets are not generally known or readily ascertainable and
have economic value as a result.    *See* (Doc. 324-1).    This conclusion is further
supported by the fact that developers and others are willing to pay Plaintiffs
substantial sums to avail themselves of Plaintiffs' information.    Indeed, Defendant
Atkinson, one of Defendants' designated experts on technical issues, has conceded
that at least some information in various categories of Plaintiffs' claimed trade
secrets is, in fact, a trade secret or not generally known.    *See* (Doc. 352-6, Ex. 32, at
274-81).

Defendants argue that Plaintiffs' trade secrets claim must fail because the
claimed trade secrets are disclosed in construction drawings filed with public
authorities in connection with permitting on Plaintiffs' previous projects with Metro
Development.    They do not argue, however, that the drawings disclose the
compilation of *all* information at issue.[7]    In addition, Plaintiffs expert, Peterson,

---

[7] In attempting to show that no issue of fact exists on this point, Defendants point generally
to publicly filed construction drawings which they attach as exhibits. They argue these

has opined in deposition that the construction drawings do not disclose the trade

secrets themselves.   (Doc. 371-1 at 10-11).   Defendants also argue Plaintiffs'

alleged trade secrets are disclosed in the patents Plaintiffs hold relating to their

lagoon technology.   Peterson, however, has opined that the patents do not disclose

the entirety of the information constituting Plaintiffs' claimed trade secret.   (Doc.

323-1 at 48-76).

It appears to be undisputed that some or much of Plaintiffs' claimed trade

secret information is disclosed in patents or filed permit drawings.   However, a

compilation or combination of information may constitute a trade secret even if

many or all its elements are publicly known or known, where the compilation adds

value to the information.   *E.g., Capital Asset Research Corp. v. Finnegan*, 160 F.3d

683, 686 (11th Cir. 1998); *La Potencia,* 733 F. Supp. 3d at 1272; *Digiport, Inc. v.

Foram Devel. BFC, LLC*, 314 So. 3d 550, 553 (Fla. 3d DCA 2020); *PSC, S.A. v.

PriceSmart, Inc.*, No. 07-21383-CIV, 2007 WL 2781021, at *5 (S.D. Fla. Sept. 19,

2007) (list of lender's customers represented trade secret because it reflected years

of effort in reviewing applications and determining which borrowers were

creditworthy and would therefore be of value to competitors).

Additionally, trade secret protection does not require absolute secrecy;

relative secrecy will suffice, that is, "secrecy sufficient to confer an actual or

---

drawings show the disclosure of various aspects of the information Plaintiffs claim as trade
secrets.   Without expert or other guidance or party admissions, however, it is impossible
for the Court to determine from Defendants' cursory references to these exhibits the extent
to which the relevant information is or is not disclosed in these drawings.

potential economic advantage upon one who possesses the information."
Restatement (Third) of Unfair Competition, § 39, comment f; *see also Picker Int'l,
Inc. v. Parten*, 935 F.2d 257, 264 (11th Cir. 1991) (holding that the existence of a
trade secret requires "a substantial element of secrecy" in the information, which
precludes protection for "information common to others in the business . . . or
known to or easily obtainable by such others") (quotation omitted) (Alabama law);
*Hurry Family Revocable Tr. v. Frankel*, No. 8:18-cv-2869-CEH-CPT, 2023 WL
23805, at *7 (M.D. Fla. Jan. 3, 2023) (holding that "[t]he secrecy requirement is
generally treated as a relative concept and requires a fact-intensive analysis")
(quoting *Kittrich Corp. v. Chilewich Sultan, LLC*, No. CV1210079GHKARGX, 2013
WL 12131376, *4 (C.D. Cal. Feb. 20, 2013)).   The Court concludes that Plaintiffs
have presented evidence sufficient to allow a conclusion the compilation trade secret
is sufficiently secret and not generally known, even if some if its constituent
elements are publicly available.

      Third, there are also issues of fact as to whether Plaintiffs' efforts to maintain
confidentiality were reasonable under the circumstances.   There is evidence that
Plaintiffs require developers creating projects using Plaintiffs' information to have
the contractors they employ enter into confidentiality or non-disclosure agreements,
and even apart from written agreements, there is an understanding Plaintiffs'
information is to be treated as confidential.   *See* (Doc. 352-8, Ex. 40 at 221-224; Ex.
49, Ex. 50, Ex. 55, Ex. 65).   There is also evidence that Plaintiffs internally allow
access to their lagoon technology information on a need-to-know basis.   (Doc. 352-8,

Ex. 75 at 59-62).

Defendants point to evidence of disclosures by Plaintiffs of some of the
alleged trade secret information to parties who did not have a written NDA in place
at the time and Plaintiffs' failure to ensure that contractors hired by developer
clients all signed NDAs as required.    Defendants do not show, however, that the
information so disclosed includes the entirety of the compilation.    Defendants'
evidence, to be sure, cuts against the reasonableness of Plaintiffs' efforts to
maintain secrecy but is not fatal.    "Measures can qualify as 'reasonable' even if
they are imperfect or they ultimately fail to thwart misappropriation.    The owner
of a trade secret is not required to employ all possible measures to preserve
secrecy."    *WWMAP, LLC v. Birth Your Way Midwifery*, 711 F. Supp. 3d 1313, 1321
(N.D. Fla. 2024).    "Thus, the reasonableness of a plaintiff's efforts to maintain
secrecy depends on the particular circumstances of each case."    *Id.*; *see also*
*Nephron Pharm. Corp. v. Hulsey*, No. 6:18-cv-1573-Orl-31LRH, 2020 WL 7684863,
at *14 (M.D. Fla. Oct. 7, 2020), *report and recommendation adopted*, 2020 WL
7137992 (M.D. Fla. Dec. 7, 2020) (conflicting evidence on reasonableness of secrecy
measures precluded summary judgment); *Furmanite Am., Inc. v. T.D. Williamson,
Inc.*, 506 F. Supp. 2d 1134, 1141 (M.D. Fla. 2007) (explaining that "[c]ourts are
extremely hesitant to grant summary judgment regarding the fact-intensive
questions of the existence of a trade secret or whether a plaintiff took reasonable
steps to protect its trade secrets.").

The existence of a trade secret or trade secrets is typically an issue of fact to

be resolved by the jury after full presentation of the evidence.   *Compulife*, 959 F.3d

at 1311.   The Court concludes that is the case here.   Plaintiffs have presented a

jury question as to the existence of the claimed compilation trade secret.

    <u>Misappropriation</u>

    A trade secret is "misappropriated" by a defendant when the defendant:

(1) acquires the trade secret knowing or having reason to know the trade
    secret was acquired by improper means (e.g., theft, bribery,
    misrepresentation, breach or inducement to breach a duty of
    confidentiality) or

(2) discloses or uses the trade secret without the owner's express or implied
    consent where the defendant—

    (a) has used improper means to obtain the trade secret; or

    (b) when the defendant used or disclosed the trade secret, it knew or had
        reason to know its knowledge of the trade secret was derived from
        someone who used improper means to acquire it, or acquired it under
        circumstances giving rise to a duty to maintain secrecy or limit use, or
        derived from a person who owed a duty to the owner to maintain
        secrecy or limit use.

*See* 18 U.S.C. § 1839(5); § 688.002(2), *F.S.*[8]

    Establishing that a defendant has used a trade secret is a "low bar" for the

plaintiff to hurdle.   *Compulife*, 959 F.3d at 1313.   Misappropriation does not

require a defendant's or use of the entirety of the trade secret, but only of a

substantial portion of it.   *Id.* at 1314; *Penalty Kick Mgmt., Ltd. v. Coca Cola Co.*,

318 F.3d 1284, 1292-93 (11th Cir. 2003) (Georgia law).   Nor is an actor insulated

---

[8] Defendants do not argue that, assuming the information at issue constituted protected
trade secrets or confidential information, they were nevertheless free to use the information
for their own purposes.   Their arguments focus instead on the assertion that Defendants
did not use the information.

from liability by virtue of adding his or her own improvements or modifications "if the result is substantially derived from the trade secret." *Id.* at 1293. "Use" of a trade secret may occur when a defendant is able to save time and money by using the trade secrets. *Id.* at 1292; *Fin. Info. Techs., Inc. v. iControl Sys., USA, LLC*, No. 8:17-cv-190-T-23MAP, 2018 WL 3391379, at *6 (M.D. Fla. June 12, 2018), *report and recommendation adopted as modified,* 2018 WL 4771060 (M.D. Fla. Oct. 3, 2018). In short, "[a]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use.'" *Compulife*, 959 F.3d at 1313 (quoting *Penalty Kick*, 318 F.3d at 1292).

The record presents issues of fact on whether Oasis and its four founders, individual Defendants Atkinson, Andreasen, Rogers, and Hall, have misappropriated Plaintiffs' trade secrets. First, Defendant Rogers agreed in deposition that he "learned how to build a lagoon in connection with the prior Lagoon projects with Crystal Lagoons." (Doc. 352-8, Ex. 40 at 152-53).

Second, Plaintiffs have also pointed to circumstantial evidence of Defendants' use of the claimed trade secrets. There is evidence from which the jury could infer that the individual Defendants had limited or no experience with lagoons using the same technology as Plaintiffs prior to their work on Crystal Lagoons projects. (Docs. 352-5, Ex. 16 at 8-18; 352-6, Ex. 32 at 26-31; 352-8, Ex. 38 at 29-32; Ex. 40 at 66). During that involvement, they gained access to Plaintiffs' claimed trade secret information. *See* (Doc. 352-3, Ex. 7, ¶¶ 8-36; 352-8, Ex. 41; Docs. 352-13 to 352-20,

Exs. 115-153).[9]   They formed Oasis in in May 2021.   By December 2021, only about 6 months later, Oasis was able to present to Metro its own "Oasis Springs" concept, similar to but in competition with Plaintiffs' Crystal Lagoons, without conducting any substantial research or development on their own.   *See* (Doc. 352-8, Ex. 40 at 149-53).   The foregoing constitutes circumstantial evidence from which a jury could conclude the Oasis Defendants used Plaintiffs' claimed trade secret information acquired by the Oasis founders when working on Crystal Lagoon projects in order to compete with Plaintiffs.   *See Mapei Corp.*, 295 So. 3d at 1199 (holding that direct evidence may be unavailable in trade secret cases and that circumstantial evidence may be used); *Sokol Crystal Prods., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (holding that, once evidence of access and similarity is proffered, it is "entirely reasonable for [the jury] to infer that [defendant] used [plaintiff's] trade secret"); *Arthrex, Inc. v. Hilton*, No. 2:21-cv-850-JLB-NPM, 2022 WL 685496, at *10 (M.D. Fla. Mar. 8, 2022) (holding that "[a]lthough the trade secret owner bears the burden of proving unauthorized use, proof of the defendant's knowledge of the trade secret together with substantial similarities between the parties' products or processes may justify an inference of

---

[9] Defendants argue that Plaintiffs have conceded that the information in Sections F.7 to F.10 of the TSID were not shared with Defendants, who therefore could not have used the information.  Plaintiffs appear to concede the point.  *See* (Doc. 349-1 at 105-06).  However, to the extent Defendants argue that because they did not have access to information in categories F.7 to F.10, then of necessity, they did not use the *entire* compilation or combination, the Court rejects that argument.  The law does not require a plaintiff in a case like this to prove the defendant used the entirety of the trade secret, but only a substantial portion of it.  *See, e.g., Compulife*, 959 F.3d at 1314; *Penalty Kick*, 318 F.3d at 1292-93.

use by the defendant") (quoting Restatement (Third) of Unfair Competition § 40 (1995)); *Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-cv-02450-WHO, 2021 WL 8820180, at *22 (N.D. Cal. Aug. 24, 2021) ("Development of a product on an 'implausibly fast' timeline can be solid evidence that it was borne of misappropriation."); *Fin. Info. Tech*s., 2018 WL 3391379, at *6 (circumstantial evidence of speed of development and similarity of products sufficient to avoid summary judgment).

Third, Plaintiffs have presented testimony of their engineering and aquatics expert David Peterson that the construction drawings on file in connection with a permit for the Parrish Lakes project, on which Oasis worked with Metro Development, demonstrate that Oasis has used a substantial portion of Plaintiffs' trade secrets.   *See generally* (Doc. 352-7, Ex. 34 at 2).

Com Pac and UAD argue, however, that Peterson's testimony catches Plaintiffs on the horns of a dilemma.   They argue that if Peterson can conclude – based on the publicly filed permit drawings for projects *Defendants* created – that Defendants used Plaintiffs' claimed trade secret information, as required to show misappropriation by the "use" of the trade secret, then it follows that similar information in publicly filed drawings for projects *Plaintiffs* created necessarily disclose Plaintiffs' claimed trade secrets to the public, thereby negating Plaintiffs' ability to show another required element, the existence of trade secrets.   But that conclusion does not follow.   Peterson, as an engineer with access to *both* the public drawings *and* the underlying information Plaintiffs allege to be a trade secret,

concludes that the publicly filed drawings reveal Defendants' *use* of the underlying information.   That conclusion does not necessarily entail the idea that the drawings reveal the underlying information itself.   To be sure, Peterson acknowledged that *some* of Plaintiffs' information is revealed in the drawings, but the claimed trade secret is the entire compilation.[10]

Finally, the Court notes that Defendants have moved to exclude Peterson's testimony on various grounds.   The Court has largely denied this motion by separate Order.

### Trade Secret Misappropriation - Standalone Trade Secrets

In addition to the compilation or combination, Plaintiffs assert that certain categories of information listed in the TSID constitute individual or standalone trade secrets.   These categories, with reference to the relevant TSID sections, are as follows: lagoon bottom drainage system (B.1); engineering consultancy report (C.1); modular treatment system (D.1); process for filling the lagoon (E.1); substantial completion checklists (E.4); systems testing reports (E.5); testing pool (E.10), equipment and supplier specifications (H.1), client identities, needs, and preferences (I.1), and pricing information relating to construction costs.

Defendants argue for rejection of these claimed trade secrets one or more

---

[10] Com Pac and UAD also argue that Peterson's opinions on Defendants' use of the claimed trade secrets attempt to "change" the claimed trade secrets from the information in the TSID to the "mental process used to arrive at the drawings," specifically, the Parrish Lakes permit drawings.   While Peterson's phrasing at times lends support to this point, a fair reading of Peterson's testimony indicates that his reference to understanding why something appears in the permit drawings is part of his explanation as to why "the use of these pieces [in the drawings] is informed by the trade secret information."   *See* (Doc. 371-1 at 14, 22).

grounds.    They argue that these items cannot constitute trade secrets because they

are generally known.    But as to Sections B.1, C.1, D.1, and E.1, Peterson's opinions

would allow a jury to conclude they are not generally known.    *See* (Docs. 323-1 at

28-32; 36ff, 42-43; 352-7, Ex 34 at 32-35; 323-2 at 26-27; 101-03); *see also* (327-6 at

147-50) (noting that Plaintiffs developed their test pool process based on years of

experience).    As to Sections E.1, E.4, E.5, and E.10, Defendant Atkinson admits

that at least some of the identified information in each category is unique to

Plaintiffs and not generally known.    *See* (Doc. 352-6, Ex. 32 at 274-76, 279-81, 293).

As to Sections H.1, I.1, and I.2, Sangree opined that information in these categories

is not generally known.    *See* (Doc. 324-1).

Defendants also point to the opinions of their expert Boyd Ramsey that the

information in Section B.1 is generally known in the geosynthetics industry.    It

does not appear, however, that Ramsey's opinion addresses all the information in

B.1.    It is also unclear the extent to which general knowledge in the geosynthetics

industry would necessarily be fatal to trade secret protection for the information in

the different context of designing and creating lagoons.[11]

As to Sections B.1 and D.1, Defendants point to publicly filed permit

drawings they assert reveal these claimed trade secrets.    As noted above, however,

---

[11] Defendants appear to argue that the relevant "industry" is an amalgam of all the
specialties and areas of expertise represented by all contractors who work for an owner
such as Metro on aspects of lagoon projects such as those of Plaintiffs.    But they offer no
legal authority or detailed argument on this point, and the Court is not convinced.    Among
other things, a jury might find in this case that contractors working on these projects are
duty bound to refrain from disclosing or making economic use of the information outside the
projects involved.

Peterson testified in deposition that the permit drawings do not reveal the entirety
of Plaintiffs' claimed trade secret information, and the Court is unable, without
further and more specific guidance from counsel or expert testimony, to determine
conclusively whether the publicly available drawings Defendants cite disclose the
entirety of the specific information in these two sections.[12]

Defendants argue that the information in E.1 and E.10 is publicly known or
readily observable by the public at existing lagoons, but their cited evidence does
not support this conclusion.   *See* (Docs. 331-11, Ex. 34 at 26-39; 335-15, Ex. 65 at
65; 329-15, Ex. 13 at 69).   They argue that information in E.10 was disclosed to
Comanco, an installer of liners, without an NDA in place, but as set forth above, the
Court concludes that whether Plaintiffs' information was kept sufficiently secret
presents an issue of fact.

Finally, Peterson in his declaration offered the opinion that the Parrish
Lakes drawings reveal Defendants' use of the information in the technical trade
secret categories.   Plaintiffs also point to evidence they argue shows examples of
Defendants' use of the standalone business trade secrets, specifically suppliers and
equipment (Section H.1), information about Plaintiffs' clients (Section I.1), and
Plaintiffs pricing and cost information (Section I.2).   *See* (Doc. 349-1 at 113-116 and
exhibits cited there).

------

[12] UAD also points to the deposition testimony of Plaintiffs' corporate representative
Javiera de la Cerda that she is not sure if Defendants had "replicated the types of
specifications" contained in the modular treatment system information, but the Court does
not regard her lack of certainty as dispositive.   *See* (Doc. 329-12, Ex. 10 at 189).

Defendants argue that the information in Section C.1 is inherently site specific, but the evidence they cite does not support their argument.    *See* (Doc. 327-6, Ex. 6 at 132-33).    As to Section E.5, the substantial completion checklist, they argue that because their designs will use different technology, it follows that any checklists will be different.    Peterson, however, opines that the Parrish Lakes permit drawings reveal the use of similar technology, and an issue of fact is presented on that score.    *See* (Doc. 352-7, Ex. 34 at 4, 9, 10).

Defendants more generally point to deposition testimony by Plaintiffs' corporate representative, Javiera de la Cerda, indicating that she did not know whether Plaintiffs had used the specific information and processes in various categories.    *See, e.g.*, (Docs. 329-12, Ex.10 at 189; 327-6, Ex. 6 at 135-36).    But Defendants do not appear to contend that her answers by themselves would preclude a finding for Plaintiffs on whether Defendants used the information.    A majority of courts have concluded that a corporate representative's failure or inability to provide evidence on a specific point in response to a deposition question does not preclude the corporation from providing such evidence at trial.    *See Ramirez v. OMBS Sec. Sys. LLC*, No. 19-20216-CIV, 2021 WL 4992569, at *9 (S.D. Fla. Aug. 20, 2021); *Cont'l Cas. Co. v. First Fin. Emp. Leasing, Inc.*, 716 F. Supp. 2d 1176, 1190 (M.D. Fla. 2010); 8A Fed. Prac. & Proc. Civ. § 2103 (3d ed.) (collecting cases).    The Court therefore does not regard de la Cerda's lack of information as dispositive.

Defendants further argue that, as they have yet to build an Oasis Spring, it

follows that they have not used the information in any of the standalone technical

trade secret categories.   They also point to Atkinson's declaration stating that

Defendants will use different technology, processes, and equipment and they have

not used, relied on, or considered various items such as the bottom drainage

information, the engineering consultancy reports, and the test pool.   *See* (Doc. 329-

8).   This argument is somewhat persuasive as to categories E.1, E.4, E.5 and E.10,

which involve information used at the end of the construction process.   As noted

above, however, Peterson's declaration presents expert opinion to the contrary.

Accordingly, while this presents a close question, the Court concludes that the issue

of Defendants' use of these claimed trade secrets is best left to the jury after

presentation of all the evidence.   The Court, however, will reevaluate the issue in

the event Defendants file a motion for judgment as a matter of law pursuant to Fed.

R. Civ. P. 50.

### *Lost Profits/Causation*

Plaintiffs' claim for lost profits from trade secret misappropriation includes

lost profits arising from the cancellation of the New Metro Contracts.   UAD argues

that nothing Defendants did caused Metro to cancel the contracts and points to

evidence that Metro acted based on problems with Plaintiffs' performance, including

technical issues, delays, and claims of misrepresentation.

Proximate causation is typically an issue of fact unless the evidence allows

only one reasonable inference.   *Anderson v. Branch Banking & Tr. Co.*, 119 F.

Supp. 3d 1328, 1353 (S.D. Fla. 2015) (quoting *Palma v. BP Products N. Am., Inc.*,

347 F. App'x 526, 528 (11th Cir. 2009)).   Defendants have presented substantial evidence on their side that Metro would have terminated the contracts regardless of Defendants' actions.   But Plaintiffs have presented circumstantial evidence that Defendants' actions influenced Metro's decision.   Metro had previously had issues and complaints about Plaintiff's' performance, and yet it still entered into the New Metro Contracts with Plaintiffs in 2018 and 2019.   *See* (Doc. 352-4, Ex. 13 at 168-69, 173-74).   Metro terminated the contracts with Plaintiffs only after Defendants formed Oasis and presented their alternative product in 2021, which Plaintiffs claim was created using Plaintiffs' trade secrets.   Issues of fact therefore remain on the issue of causation.

### *Breach of Contract*

Com Pac moves for summary judgment on Plaintiffs' claim for breach of contract (specifically, a nondisclosure agreement).   Com Pac's brief argument on this point refers to its arguments relating to the claimed secrets, *i.e.*, that the information at issue is generally known or has been publicly disclosed and therefore is not protected.   For the reasons stated above in connection with the trade secret claims, the Court denies Com Pac's motion as to this ground.

### *Tortious Interference*

Plaintiffs assert a claim for tortious interference with business relationships against the Oasis Defendants.   "Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the

defendant's knowledge of the business relationship; (3) the defendant's intentional

and unjustified interference with the relationship; and (4) damage to the plaintiff."

*Int'l Sales & Serv., Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1154

(11th Cir. 2001) (citing *Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So. 2d 812,

814 (Fla. 1994)).   "A business relationship need not be evidenced by a contract, but

it generally requires 'an understanding between the parties [that] would have been

completed had the defendant not interfered.'" *Id.* (quoting *Ethan Allen*, 647 So. 2d

at 814).[13]

The Oasis Defendants' motion focuses on the third element, intentional and

unjustified interference.   They argue that they lacked the intent to procure the

termination of the New Metro Contracts, and note in that regard that Oasis

contracted with Metro in August 2023, months after Metro had terminated the

contracts with Plaintiffs.[14]   Plaintiffs, however, point to evidence that the

individual Defendants formed Oasis in May of 2021 and reached out to Metro to

---

[13] The Oasis' Defendants' motion refers to interference with "contract," but Plaintiffs' claim
is pleaded as one for interference with business relationships, even though the
relationships at issue appear to be evidenced by contracts, specifically the 2018 TLSAs
between Plaintiffs and Metro.   The elements of a claim for interference with a business
relationship are basically the same as for interference with contract, but without the
requirement of an enforceable contract.   The Oasis Defendants do not challenge the
existence of the required business relationship (or contract).   The Court also notes that it
appears undisputed for purposes of this motion that the 2018 New Metro Contracts and the
business relationship they reflect were terminated by Metro Development in early 2023.
[14] Plaintiffs argue that the Oasis Defendants were aware of the New Metro Contracts based
in part on documents showing that Chrisopher Souza, currently President of Oasis
Amenities, was aware of these contracts in 2018 and 2019 when he worked for Plaintiffs.
The Oasis Defendants argue that the Court should not consider these documents because
they were not timely produced by Plaintiffs.   Because the Oasis Defendants do not argue
they were unaware of the New Metro Contracts when dealing with Metro, the Court will
defer consideration of the admissibility of these documents.

pitch their competing technology in December 2021.    Defendants argue that at the December 2021 meeting with Metro, they did not compare their Oasis Springs "technology" to that of Plaintiffs.    This assertion, somewhat implausible on its face under the circumstances, is also cast into doubt by internal Oasis documents created for the meeting that discuss Plaintiffs' projects.    *See* (Doc. 352-8, Ex. 70).[15] Plaintiffs also point to Oasis's dealings with Metro after the December 2021 meeting but before termination, including an April 2022 contract relating to the Parrish project, already the subject of a TSLA between Plaintiffs and Metro.    *See* (Doc. 352-5, Ex. 19).

A party's intent is a question of fact that is generally ill-suited to summary judgment. *See, e.g.*, *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1243 (11th Cir. 2013); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991) ("As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial.").    The Court concludes the evidence taken as a whole would allow an inference that Defendants intended to supplant Plaintiffs' relationship with Metro with respect to the projects reflected in the New Metro Contracts.

As noted above, tortious interference also requires that interference that is "unjustified," which can be shown by improper conduct such as conduct that is

---

[15] Further doubt on this point arises from Rogers's testimony that he did not recall discussing Plaintiffs or their projects at the December 2021 but believes they did not do so because it was not Oasis' approach or practice to do so.    Plaintiffs point to documents suggesting that was not the case.    *See* (Doc. 352-10, Ex. 89 at LF0001018; 352-12, Ex. 111).

tortious or violates a statute.   *See GNB, Inc. v. United Danco Batteries, Inc.*, 627
So. 2d 492, 494 (Fla. 2d DCA 1993) (Altenbernd, J., dissenting in an opinion the
majority held to be "entirely correct" with respect to its explanation of the law).
There is also a privilege to compete as long as the means used are not improper.
*Int'l Sales*, 262 F.3d at 1159.   The second amended complaint alleges improper
conduct in the form of (1) misrepresentations by the Oasis Defendants regarding
Plaintiffs' Crystal Lagoons technology and (2) misuse of Plaintiffs' trade secrets and
confidential information.   (Doc. 102 at ¶¶ 55, 106-108).

The Oasis Defendants argue that they were permitted to compete for Metro's
business and used no improper means to do so.   They argue the record is devoid of
evidence of misrepresentations by them, and Plaintiffs in response do not point to
any.   The Oasis Defendants argue they also did not engage in trade secret
misappropriation.   But the record evidence discussed above presents issues of fact
regarding Defendants' misappropriation of trade secrets and confidential
information.[16]

---

[16] Plaintiffs have not identified any misrepresentations made by Defendants.   It therefore
appears Plaintiffs' tortious interference claim is based solely on Defendants' alleged
misappropriation of trade secrets.   Plaintiff should carefully consider whether to move
forward with this seemingly duplicative and unnecessary claim, particularly given the
limitations on trial time imposed by the Court's June 2, 2025, Order.   *See* (Doc. 438).   In
addition, at the pretrial conference the Court will consider whether Plaintiffs' tortious
interference and FDUTPA claims should be eliminated from the case due to preemption by
the Florida Uniform Trade Secrets Act, § 688.008(1), *F.S.   See, e.g.*, *B & D Nutritional
Ingredients, Inc. v. Unique Bio Ingredients, LLC*, No. 16-62364-CIV, 2017 WL 8751753, at
*3 (S.D. Fla. Feb. 10, 2017) (noting that "FDUTPA and tort claims are preempted and 'will
be dismissed if they contain no material distinction from the FUTSA claim.'") (quoting *Am.
Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla.
2005)); Fed. R. Civ. P. 16(c)(2)(A)-(E).   While the parties have not raised preemption as an
issue, the Court has chosen to bring it up before the trial starts to avoid unnecessary
confusion of the issues and wasted time.

Finally, the Oasis Defendants argue there was no interference because Metro was predisposed to terminate its business relationship with Plaintiffs and nothing Defendants did caused Metro to do so, even if their offer of their competing product made it possible.   They point to, among other things, the specific reasons given in Metro's notice of intent to terminate the contracts, including cost overruns and alleged misrepresentations by Plaintiffs.   The Oasis Defendants also argue that it was Metro who reached out to them in August 2022 to solicit proposals for a number of different projects, including but not limited to projects already the subject of contracts with Plaintiffs.   As noted above, however, Plaintiffs have pointed to Oasis's dealings with Metro predating August 2022.   Plaintiffs also point to evidence that Metro previously had issues and complaints about Plaintiffs' performance, and yet still entered into the New Metro Contracts with Plaintiffs as well as a memorandum of understanding for additional projects.   Issues of fact therefore remain and summary judgment on the tortious interference claim will be denied.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)    "Unique Aquatic Design, Inc.'s Motion for Partial Summary Judgment on Two Issues: (1) Defendants Did Not Misappropriate the Trade Secrets, and (2) Defendants Did Not Proximately Cause Lost Profits" (Doc. 329) is **DENIED**.

(2)    "Oasis Amenities, LLC, Scot Andreasen, Dean Atkinson, Raymond

Douglas Hall, and Jacob Rodgers' Motion for Summary Judgment" (Doc.

330) is **DENIED**.

(3)     "Com Pac Filtration, Inc's Motion for Partial Summary Judgment:

Plaintiffs' Information Does Not Qualify as a Trade Secret" (Doc. 331) is

**DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 7th day of

August, 2025.

TOM BARBER
UNITED STATES DISTRICT JUDGE